IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEROALD HOPKINS, | § | |
| | § | |
| Plaintiff | § | |
| | § | Civil No. 1:21-cv-334 |
| -v- | § | |
| | § | |
| WAYSIDE SCHOOLS, | § | |
| | § | |
| Defendant. | § | |

PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

NOW COMES Plaintiff Deroald Hopkins and files Plaintiff's Original Complaint.

When Deroald Hopkins was hired by Wayside Schools ("Wayside") as the COO/CFO in November 2017, he became the first and only African American not only on the Executive Committee, but in management at Wayside Schools. At first, everything went well. Mr. Hopkins' performance was praised by Superintendent Matthew Abbott. Unfortunately, all of that changed when Mr. Hopkins began reporting to Mr. Abbott and Wayside Schools that it was mismanaging federal funds.

For example, Mr. Hopkins discovered that federal Special Education (SPED) funds were being improperly used to settle complaints, claims, and lawsuits from parents regarding the treatment of their children, as well as for paying Wayside's legal costs. He also discovered that all of Wayside Schools' money was being

commingled in one account, including operational funds, state and federal funds, and debt service funds.

When Mr. Hopkins began reporting these and other issues, he was retaliated against, falsely accused of misconduct—which he was later cleared of—and ultimately terminated for a pretextual reason. Similarly situated, non-African American employees were not treated the same way.

Wayside Schools' actions violate the law.

## I.
## PARTIES

1. Plaintiff Deroald Hopkins is an individual who resides in Travis County, Texas.

2. Defendant, Wayside Schools, is an open-enrollment charter school located in Travis County and may be served through its registered agent, Joseph Hoffer, at Schulman, Lopez, Hoffer & Adelstein, LLP, 7200 N. Mopac Expy, Suite 160, Austin, Texas 78731.

## II.
## JURISDICTION AND VENUE

3. This Court has original jurisdiction to hear this complaint under 28 U.S.C. § 1331, this action being brought under 41 U.S.C. § 4712(c)(2) and 42 U.S.C. § 1981. To the extent sovereign immunity exists for a charter school, such immunity has been waived and/or abrogated by 42 U.S.C. § 2000d-7 and 42 U.S.C. § 1983.

4. Venue is appropriate because the acts giving rise to this lawsuit occurred within the Western District of Texas.

## III.
## FACTS

5. Mr. Hopkins, African American, first started working for Wayside Schools as its COO/CFO in November 2017.

6. For the duration of his employment, Mr. Hopkins always gave his best efforts.

7. Throughout his tenure at Wayside Schools Mr. Hopkins was not only the first African American on the Executive Committee, but he also remained the only African American on the Executive Committee.

8. In fact, Mr. Hopkins was the only African American in management period.

9. In the only performance evaluation Mr. Hopkins received, he was commended for his strong leadership of the FinOps team.

10. In fact, he was told that he had been very effective in launching new systems, controls, and processes.

11. Moreover, the evaluation also said that he had the trust of both his team members and cabinet members, and he was lauded for stepping up in his role.

12. Unfortunately, from the beginning, Mr. Hopkins noticed financial issues with Wayside Schools.

13. Wayside Schools receives over $1,000,000 in federal funds from the Department of Education each year through the Texas Education Agency.

14. These funds come through statutes and programs such as Title I, Part A; IDEA B; Child Nutrition Grants; School Improvement Grants; Title II, Part A; Title III, Part A; Title IV, Part A, subpart 1.

15. For instance, he discovered that teachers, who lacked proper authority, were signing contracts on behalf of the school.

16. Mr. Hopkins also discovered numerous financial errors, mismanagement, and misappropriation of both state and federal funds received by Wayside Schools.

17. Among other things, Mr. Hopkins, along with the auditors at MJ McConnell & Jones, as well as representatives from Charter School Success uncovered that the way revenue accrual was being booked was incorrect.

18. By way of example, certain expenses were not getting entered at the end of the fiscal year.

19. That mismanagement caused a host of problems resulting in Wayside not receiving the accurate and appropriate federal funds for reimbursement; additionally, it sheds light on how Wayside may have misstated its liabilities to the TEA, and how Wayside is in violation of reporting requirements.

20. For federal funds received on a reimbursement scale, the prior CFO for Wayside Schools was not properly entering those expenses into the system in order to receive proper reimbursement. If Mr. Hopkins had not caught this gross mismanagement, then it would have affected Wayside Schools' funding levels.

21. Mr. Hopkins, the auditors, and Charter School Success also discovered that federal money, including SPED funds, and bond proceeds were being miscoded, which meant they were not being used for their required purposes. For example, SPED funds were being improperly used to settle complaints, claims, and lawsuits from parents regarding the treatment of their children, as well as for paying Wayside's legal costs.

22. Moreover, Mr. Hopkins discovered that all of Wayside Schools' money was being comingled in one account, including operational funds, state and federal funds, and debt service funds.

23. Apparently, this improper coding and comingling had been going on for years.

24. There are many more errors and examples of mismanagement of federal and state funds, all of which have been corroborated by the auditors.

25. Mr. Hopkins reported this gross mismanagement of funds related to federal money to the Superintendent, the finance committee, the auditors, and the external finance team. These issues were disclosed during board meetings, committee meetings, and in individual meetings up until November 2019.

26. The Superintendent, the finance committee, the auditors, and the external finance team each had the responsibility to investigate, discover, and/or address the misconduct that Mr. Hopkins and the auditors reported.

27. However, instead of taking action to correct this matter, Wayside Schools put a target on Mr. Hopkins' back.

28. First, Katherine Fugate, the Director of the SPED program, made many claims about Mr. Hopkins including accusing him of misappropriating federal funds, making disparaging comments about her, and claiming she was being ignored and excluded by him. However, Wayside Schools' own investigation found each of these claims to be unsubstantiated or false.

29. Then, Mr. Hopkins determined that Wayside Schools was in default on a bond covenant. It was then that Wayside decided that it did not want this transparency.

30. Mr. Hopkins was fired less than two months later on January 7, 2020, for a pretextual reason by Matthew Abbott, the Superintendent, and John Troy, chairman of the school board and finance committee member. Both of them are white.

31. The reason is demonstrably false. Mr. Hopkins was allegedly fired for a "lack of clear communication and reliable board reporting."

32. But, as stated above, according to the only performance evaluation Mr. Hopkins received, he was commended for his strong leadership, the trust he had fostered with team members, and his effective implementation of systems, controls, and processes.

33. Mr. Hopkins was also allegedly fired for "submitting an incorrect budget amendment" that required another amendment to fix.

34. This reason is pretext because the reason the budget amendment was incorrect had to do with the financial mismanagement that Mr. Hopkins and the auditors uncovered and reported.

35. Similarly, the "other financial errors and failures" he was allegedly fired for are actually the errors and mismanagement he reported.

36. One of the real reasons for his termination is retaliation for Mr. Hopkins' whistleblowing efforts, which brought to light all of these financial issues that had been accumulating over previous fiscal years.

37. The other reason is because of Mr. Hopkins' race.  As mentioned above, Mr. Hopkins was the first and only African American on the Executive Committee for the duration of his employment.  Superintendent Abbott treated him differently than non-Black executive committee members.  For example, the Superintendent would yell at him and engage in name-calling when Mr. Hopkins was reporting the financial mismanagement that he and the auditors uncovered.

38. Further, on one occasion when Mr. Hopkins was in a Houston hospital caring for his son, who was receiving intense medical treatment. While at the hospital, he took a call from Mr. Abbott.  When Mr. Hopkins told Mr. Abbott that there were many problems with the financials and that he was not going to fake any numbers, Mr. Abbott called him a jerk and then muttered several other insulting names under his breath.  Non-African American management employees were not subjected to such name calling and demeaning behavior.

39. Perhaps the most telling fact that shows race played a role is that only Mr. Hopkins, the black employee, was fired for reporting the financial mismanagement of state and federal funds.

40. The two auditors from McConnell & Jones who worked on the Wayside Schools FYE 2018/2019 audit also allegedly engaged in the same misconduct that supposedly led to Mr. Hopkins' termination. They both also reported the financial mismanagement along with a whole host of other accounting errors from previous fiscal years that had to be corrected in order for the audit to be clean without an opinion. But, unlike Mr. Hopkins, instead of being fired or even reprimanded, they continue to work for Wayside Schools. Neither of those auditors are African American.

41. On May 13, 2020, Mr. Hopkins submitted his whistleblower report to the OIG for the Department of Education alleging that he was terminated in violation of 41 U.S.C. § 4712.

42. The OIG dismissed the complaint without investigation on June 20, 2020.

43. All conditions precedent to the filing of this suit have been met.

IV.
CAUSE OF ACTION: VIOLATION OF 41 U.S.C. § 4712

44. Plaintiff Hopkins incorporates paragraphs 1-43 as if restated herein.

45. To the extent sovereign immunity exists, such immunity is waived via 42 U.S.C. § 2000d-7.

46. Defendant Wayside Schools is a contractor, subcontractor, grantee, or subgrantee of the federal government under 41 U.S.C. § 4712.

47. Plaintiff reported information that he reasonably believes is evidence of gross mismanagement of a federal contract or grant, an abuse of authority relating to a federal contract or grant, or a violation of law, rule or regulation related to a federal contract or grant when he reported the mismanagement and abuse of authority detailed above.

48. Plaintiff reported the above to a management official or other employee of Defendant who has the responsibility to investigate, discover, or address misconduct and put in place the proper accounting controls.

49. Plaintiff's reports described above were a contributing factor in his termination.

50. Because of the actions of the Defendant, Plaintiff has suffered harm and damages.

## V.
## CAUSE OF ACTION: VIOLATION OF SECTION 1981

51. Plaintiff incorporates paragraphs 1-50 as if restated herein.

52. To the extent sovereign immunity exists, this cause of action is being brought through 42 U.S.C. § 1983.

53. Plaintiff was denied equal rights and benefits under 42 U.S.C. §1981 because of his race through discrimination.

54. Defendant denied Plaintiff equal rights through discriminatory acts when, among other actions, it terminated Plaintiff because of his race.

## VI.
## JURY DEMAND

55. Plaintiff demands trial by jury.

## VII.
## DAMAGES

56. Plaintiff seeks all damages allowed under the law, including monetary relief like back pay, benefits, and lost wages. Additionally:

    (a) Plaintiff seeks an injunction prohibiting Defendant from engaging in unlawful practices including race discrimination and whistleblower retaliation as well as an injunction requiring a more diverse executive committee, board of trustees, and management team.

    (b) Plaintiff seeks additional equitable relief as may be appropriate such as reinstatement, promotion, front pay, and court costs.

    (c) Plaintiff seeks compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

    (d) Plaintiff seeks exemplary damages.

    (e) Plaintiff seeks reasonable attorneys' fees and costs including reasonable expert fees.

    (f) Plaintiff seeks pre and post judgment interest at the maximum rate allowed by law.

    WHEREFORE, premises considered, Plaintiff respectfully prays that Defendant be cited to appear and, that upon a trial on the merits, that all relief requested be awarded to Plaintiff, and for such other and further relief to which Plaintiff is justly entitled.

Respectfully submitted,
WILEY WALSH, P.C.

By: ___/s/ Colin Walsh___
Colin Walsh
Texas Bar No. 24079538
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*
Jairo Castellanos
Texas Bar No. 24089624

WILEY WALSH, P.C.
1011 San Jacinto Blvd., ste 401
Austin, TX 78701
Telephone: (512) 27-5527
Facsimile:  (512) 201-1263
colin@wileywalsh.com
ATTORNEYS FOR PLAINTIFF

___